IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK KENNETH BENSON,<br><br>                 Petitioner,<br><br>        vs.<br><br>D. K. SISTO, Warden, California State<br>Prison, Solano,<br><br>             Respondent. | No. 2:07-cv-02244-JKS<br><br>MEMORANDUM DECISION |

Petitioner Frank Kenneth Benson, a state prisoner appearing *pro se*, has filed a Petition for Habeas Corpus Relief under 28 U.S.C. § 2254. Benson is currently in the custody of the California Department of Corrections, incarcerated at the California State Prison, Solano. Respondent has answered and Benson has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

In January 1984 Benson was convicted in the Alameda County Superior Court on a *nolo contendere* plea of Murder in the Second Degree (Cal. Penal Code, § 187). The Alameda County Superior Court sentenced Benson to an indeterminate prison term of 15 years to life. Benson does not challenge his conviction or sentence in this proceeding.

In June 2006 Benson appeared at a parole-suitability hearing before the California Board of Parole Hearings. Benson appeared before the Board at the outset of the hearing to protest the institution's requirement that he be physically restrained during the hearing. When his request that he be permitted to appear unrestrained was denied, Benson voluntarily left the hearing room.

The Board, proceeding *in absentia*, found Benson unsuitable for parole.  Benson timely sought

habeas corpus relief in the Alameda County Superior Court, which denied relief in an unreported,

reasoned decision.  Benson's subsequent petition for habeas corpus relief filed in the California

Court of Appeal, First Appellate District, was summarily denied without opinion or citation to

authority, by a divided vote in an unreported decision.  A divided California Supreme Court

summarily denied review without opinion or citation to authority on July 18, 2007.  Benson

timely filed his Petition in this Court on October 17, 2007.

On April 5, 2010, this Court stayed further action in this case pending the issuance of the

mandate by the en banc panel of United States Court of Appeals for the Ninth Circuit in

*Hayward*.[1]  The Court of Appeals has rendered its decision in *Hayward*;[2] therefore, this Court

now terminates its stay and decides the case.

As recited by the dissent in the California Court of Appeal, the facts of the underlying

commitment offense are:

> In December 1981, Benson strangled his wife and in December 1983 pled
> nolo contendere to second degree murder, receiving a sentence of 15 years to life
> imprisonment.  To date he has served more than 21 years in prison and has been
> denied parole on nine consecutive occasions.
> The circumstances of the crime were acknowledged by Benson at the
> commencement of his most recent parole hearing:  "This was Benson's second
> marriage and he had a son Eric who was [11] years old at the time of the crime.
> Eric lived with his mother and stepfather. . . .  Mrs. Benson suffered from
> psychomotor epilepsy and had several incidents of memory loss, rage, and
> inexplicable behavior prior to December 1981.  An investigation concluded that
> the Bensons used marijuana and hashish frequently and had a history of substance
> abuse.  The Bensons' marriage was stormy and there were frequent separations.

---

[1] *Hayward v. Marshall*, 512 F.3d 536, *reh'g en banc granted*, 527 F.3d 797 (9th Cir. 2008).

[2] *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc).

Mrs. Benson's children had been taken from her by the courts and she felt that if she could not have her children . . . Benson should not be able to have his son Eric.  Mrs. Benson was openly jealous of Eric and referred to him as the little creep or a queer. . . .  [On the day in question]  Benson met his wife for drinks. They smoked some marijuana on the way to dinner and had a few more drinks with dinner.  They smoked some more marijuana on the way home after dinner. After dinner they went back to the apartment, played dominos, watched television, and smoked marijuana.  At approximately midnight Mrs. Benson became aware that Eric was in the apartment and she became enraged.  An argument ensued and kept escalating until  . . . Benson told her to shut up and slapped her. . . .  Benson then grabbed her around the neck and told her to shut the fuck up.  He continued strangling for about five minutes.  He believed he had killed her and he checked her pulse finding no signs of life."  He later tied a large brick to her body, which he drove to the San Mateo Bridge, where he dumped her weighted body into the bay.  He filed a missing person report but confessed when his story unraveled. During his most recent psychological assessment he reiterated, as he has many times previously:  "on the night of the offense . . . his wife [went] into a lengthy verbal rage directed toward him and his son.  When she began hitting and spitting on his son he says he lost control and began strangling her to try to keep her quiet. When she slumped to the floor he realized she was dead. . . ."[3]

## II.  GROUNDS RAISED/DEFENSES

Benson raises two grounds for relief:  (1) the decision of the Board was unsupported by sufficient reliable evidence; and (2) the Board violated California law and denied him a fair and unbiased hearing.  Respondent raises no affirmative defense.[4]

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based

---

[3] Docket 10-3, pp. 79-80.

[4] *See* Rules—Section 2254 Cases, Rule 5(b).

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[5]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[6]  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.[7]  Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[8]  When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must be objectively unreasonable, not just incorrect or erroneous.[9]  The Supreme Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing that the state court determination was incorrect.[10]  "[A]bsent a specific constitutional violation, federal habeas corpus review of [state criminal proceedings] is limited to whether the

---

[5] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade*, 538 U.S. 63, 70-75 (2003) (explaining this standard).

[6] *Williams*, 529 U.S. at 412.

[7] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[8] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations by the Court); *see Wright v. Van Patten*, 552 U.S. 120, 127 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[9] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[10] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

4

error 'so infected the [proceedings] with unfairness as to make the [result] a denial of due

process.'"[11]  In a federal habeas proceeding, the standard under which this Court must assess the

prejudicial impact of constitutional error in a state-court criminal trial is whether the error had a

substantial and injurious effect or influence in determining the outcome.[12]  Because state court

judgments of conviction and sentence carry a presumption of finality and legality, Benson has the

burden of showing by a preponderance of the evidence that he merits habeas relief.[13]

In applying this standard, this Court reviews the last reasoned decision by the state

court.[14]  Under AEDPA, the state court's findings of fact are presumed to be correct unless the

petitioner rebuts this presumption by clear and convincing evidence.[15]  This presumption applies

to state trial courts and appellate courts alike.[16]

## IV.  DISCUSSION

Respondent contends that Benson does not have a sufficient liberty interest in parole to

support federal habeas corpus relief[17] and, in any event, his due process rights were satisfied.[18]

---

[11] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[12] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[13] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[14] *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004).

[15] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[16] *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

[17] *See Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 7 (1979).

[18] *See id.* at 15.

These two contentions are foreclosed by the en banc decision in *Hayward*. *Hayward* made clear

that California law provides the predicate for application of the "some evidence" rule in a federal

habeas proceeding,[19] thus disposing of Respondent's contentions.

Ground 1:  Insufficiency of the Evidence.

Benson argues that the decision of the Board to deny him parole was primarily based

upon the nature of the 25-year-old commitment offense and the determination that he would pose

an unreasonable danger to the public was unsupported by reliable evidence.  The Board gave the

following explanation for denying Benson parole:

> **PRESIDING COMMISSIONER FARMER:**  All right, we've returned for a
> decision in the matter of Frank Benson, C-80247.  The Panel has reviewed all
> information available to it at the Hearing contained in Mr. Benson's File
> (indiscernible), the letters that were submitted and the absence of Mr. Benson and
> lack of information (indiscernible).  We considered all of the above and we rely
> upon the following circumstances in concluding that the Mr. Benson remains
> unsuitable for parole and would continue to pose an unreasonable risk of danger
> to society and a threat to public safety if released.  That decision is based initially
> on the commitment offense, which was carried out in a specially cruel and callous
> manner, that during the course of that, the victim was abused, defiled and
> mutilated and (indiscernible) of course, the offense was carried out in a manner
> demonstrating an exceptionally callous disregard for human suffering.  The
> motive for the crime was either unexplicable in that we really don't know exactly
> what was going on or was the product of extreme rage over the inmate's son and
> was obviously trivial in relation to the resulting death.  And these conclusions are
> drawn from the circumstances of the offense as recited, which indicates that
> during -- in the midst of a relationship that was tumultuous, first by the prisoner's
> own description, and which came to an evening of drug and alcohol taking and a
> dispute which had been long simmering over the inmate's son, it resulted in a
> violent outburst by the defendant in which his wife was attacked and strangled.
> And then to cover up the crime, the inmate, apparently with his son, transported
> her body and dumped in the San Francisco Bay.  The District Attorney reported
> prior instances of domestic violence reported, none of which had resulted in the
> inmate's conviction, but they were reported in the letter that became part of the

---

[19] *Hayward*, 603 F.3d at 561-62; *Pearson v. Muntz*, 606 F.3d 606 (9th Cir. 2010) (per
curiam).

probation report and was obviously considered by the court.  So, while Mr.
Benson did not have a history of -- an extensive of criminal conduct, obviously his
history within this relationship was extremely tumultuous.  Within the institution,
and by institutional measurements, Mr. Benson would seem to be a model inmate.
He has a total of three 115 disciplinaries, and the last one occurred

      **DEPUTY COMMISSIONER MAY:**  1996.

      **DEPUTY COMMISSIONER MAY:**  -- 1996, whatever date it was
(indiscernible)

      **DEPUTY COMMISSIONER MAY:**  1988.

      **PRESIDING COMMISSIONER FARMER:** 1988, he is essentially has
been disciplinary free.  He apparently does his job well. He -- within the context
of the institution, he performs admirably.  He appears to get self-help and therapy
and, frankly, he has been in for a long time relative to this offense.  He's been in
custody, I calculated it out to 26 years now.  He has parole plans that although
appear to reflect a marketable skill and have previously been found adequate, the
Panel cannot find them to be inadequate (sic, adequate?[20]), they also are lacking in
specificity and, of course, the inmate is unavailable to us to obtain greater
specificity.  The psychological reports have been considered, the last one prepared
on February 14, 2004.  They again describe the inmate in favorable terms relative
to his institutional status.  What is of concern to the Panel is without wishing to
appear to be an expert, which I am not, but under circumstances where you have a
crime that was committed in the context of domestic violence, and that
circumstance does not appear to have been specifically addressed either in any of
the therapy,  self-help or assessments by the inmate, there is concern in that,
within the institutional confines, the stresses that present themselves in a domestic
situation are not present nor replicated, and absent those issues being addressed,
there will be -- always potentially be concern as to how the self-help, which the
inmate has admittedly participated in to a great deal through working in substance
abuse counseling and other studies, how that translates into the domestic violence
setting.  It is further troubling in that by his absence, the inmate does not have the
-- does not give himself the opportunity to present affirmative evidence to the
Panel which would allow them to make a finding that those issues,  which we
deem of significant importance, to be addressed.  Further, of concern with respect
to Mr. Benson's absence, is the fact that certainly there is no quarrel with his right
to address and -- with an institutional setting and potentially before the court, the
issue of his restraint.  When given the options in determining what was in his best
interests to appear at the Hearing and present his views regarding the offense, or,

---

[20] Given context of the rest of the sentence and the concerns raised during the hearing
about the currency and specificity of employment prospects [Docket 10-2, pp. 85-76 (Presiding
Commissioner) and pp. 89-90, 96 (Deputy District Attorney Ynostroza)] this appears to be either
a misstatement or erroneous transcription.  More likely than not, the Board found the parole plans
to be inadequate, or, at least, of questionable adequacy in the absence of further elaboration.

and still not appear on the record to acquiesce to the restraint (indiscernible) to continue to contest that in a manner which would preserve his objection for the record, he chose despite pleas to remain, not to remain.  What this Panel takes as relevant from that is that Mr. Benson appears by the limited observation of him in this Hearing setting, and by reports in the correctional counselor's report that a -- referring to the assessment section of the Board report of May 2006, inmate Benson makes no secret of his delusion with the parole and sentencing process and certainly that statement is (indiscernible) reflected his appearance today.  But that attitude, while certainly within his rights, leaves a void that cannot be filled by just looking at the record in a context where, if we are to make a finding of suitability for release, although the record would show what appears to be positive factors, that the absence of addressing those concerns and allowing hearing from the inmate to indicate that the issues relating to domestic violence have been affirmatively addressed, makes it impossible to ascertain any favorable factors that exist, nevertheless outweigh the seriousness of the crime and the nature of the crime and it's potential and seriousness should he be because of the nature of the crime and the fact these issues haven't been addressed, he remains in the Commissioners' opinions a danger if released at this time.  Thus the finding of unsuitability -- the decision is rendered for one year is to reset for Hearing or should be calendared for Hearing in June of 2007.  He should specifically continue to remain disciplinary free, and he is encouraged to get self-help and seek therapy to specifically address the issues of domestic violence.  He's advised further to continue to document his parole plans and is encouraged to be more specific, specifically about where he would live and how he would support himself.  And that concludes my observations (indiscernible).[21]

The Alameda County Superior Court rejected Benson's arguments, holding:

> The Petition for writ of habeas corpus is denied.  The Petition fails to state a prima facie case for relief.  Even though [Benson] has submitted numerous documents in support of his Petition, review of the transcripts provided and documents pertaining to the June 23, 2006 hearing, indicate that there was no abuse of discretion by the Board of Prison Terms.  The factual basis of the BPTs decision granting or denying parole is subject to a limited judicial review.  A Court may inquire, only whether some evidence in the record before the BPT supports the decision to deny parole.  The nature of the offense alone can be sufficient to deny parole.  (In Re Rosenkrantz (2002) 29 Cal4th 616, 652, 658, 682; In Re Dannenberg (2005) 34 Cal4th 1061[.]  The record presented to this Court for review demonstrates that there was certainly some evidence, including, but not limited to the committing offense, [Benson's] lack of self help programming for domestic violence and a lack of specific job opportunities or plans.  There is

---

[21] Docket No. 10-2, pp. 99-102.

nothing in the record that indicates that the Board's decision was arbitrary or capricious, nor that [Benson's] equal protection or due process rights were violated. Thus, [Benson] has failed to meet his burden of sufficiently proving or supporting the allegations that serve as the basis for habeas relief.[22]

In this case, this Court "need only decide whether the California judicial decision approving the [Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or 'was based on an unreasonable determination of the facts in light of the evidence.'"[23]   Consequently, this Court must canvas and apply California law to the facts in the record.  Under California law "some evidence" of future dangerousness is a *sine qua non* for denial of parole.[24]  As the Ninth Circuit noted:

> As a matter of California law, "the paramount consideration for both the Board [of Prison Terms] and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety." (Footnote omitted)  There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety." (Footnote omitted).  The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre or post-incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness.  (Footnote omitted.)  Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."  (Footnote omitted.)[25]

Under California law, a parole release date must be set "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the *public safety* requires a

---

[22] Docket 10-2, p. 160.

[23] *Hayward*, 603 F.3d at 563 (footnotes citing 28 U.S.C. § 2254(d) omitted).

[24] *In re Lawrence*, 190 P.3d 535, 549 (Cal. 2008); *In re Shaputis*, 190 P.3d 573, 582 (Cal. 2008).

[25] *Hayward*, 603 F.3d at 562 (omitted footnotes are pinpoint citations to *Lawrence*) (internal alteration in the original).

more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed . . . ."[26]  "The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole."[27]  The Board must, however, "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released.[28]  The Board "may credit evidence suggesting the inmate committed a greater degree of the offense than his or her conviction evidences."[29]  "[T]he statutory and regulatory mandate to normally grant parole to life prisoners who have committed murder means that, particularly after these prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness."[30]  Where, however, the record also contains evidence of other factors relevant to showing unsuitability for parole, the aggravating circumstances of the crime reliably may continue to predict current dangerousness even after many years of incarceration.[31]

The California Supreme Court has provided substantial guidance on the factors to be considered in applying these general principles.

---

[26] Cal. Penal Code § 3041(b) (emphasis added); *Lawrence*, 190 P.3d at 546; *see Rosenkrantz*, 59 P.3d at 202-03.

[27] *In re Rosenkrantz*, 59 P.3d 174, 222 (Cal. 2002).

[28] *In re Dannenberg,* 104 P.3d 783, 786-87, 802-803 (Cal. 2005); *see Rosenkrantz*.

[29] *Dannenberg*, 104 P.3d at 803 n.16 (citing *Rosenkrantz*, 59 P.3d at 219).

[30] *Lawrence*, 190 P.3d at 553.

[31] *See Shaputis*, 190 P.3d at 584-85.

Title 15, section 2402 of the California Code of Regulations sets forth the factors to be considered by the Board in carrying out the mandate of the statutes.[FN13]  This regulation is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. (Regs., § 2402, subd. (a).)[FN14]  The regulation also lists several circumstances relating to unsuitability for parole[FN15]— such as the heinous, atrocious, or cruel nature of the crime, or an unstable social background; and several circumstances relating to *suitability* for parole—such as an inmate's rehabilitative efforts, demonstration of remorse, and the mitigating circumstances of the crime.[FN16]  (Regs., § 2402, subds. (c), (d).)  Finally, the regulation explains that the foregoing circumstances "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel."  (Regs., § 2402, subds. (c), (d).) [. . . .]

[FN13.]  Petitioner's parole suitability is governed by Title 15, section 2402, which we addressed in *Rosenkrantz, supra,* 29 Cal.4th 616, 128 Cal.Rptr.2d 104, 59 P.3d 174—a discussion excerpted in substantial part below.  In the companion case of *Lawrence, supra,* 44 Cal.4th 1181, 82 Cal.Rptr.3d 169, 190 P.3d 535, the inmate's parole suitability is governed by Title 15, section 2281, which provides parole consideration criteria and guidelines for murders committed prior to November 8, 1978.  The two sections are identical.

[FN14.]  These factors include "the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Regs., § 2402, subd. (b).)

[FN15.]  Unsuitability factors are: (1) a commitment offense carried out in an "especially heinous, atrocious or cruel manner"; (2) a "[p]revious [r]ecord of [v]iolence"; (3) "a history of unstable or tumultuous relationships with others"; (4) "[s]adistic [s]exual [o]ffenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "[t]he prisoner has engaged in serious misconduct in prison or jail." (Regs., § 2402, subd. (c)(1)-(6).)  This subdivision further provides that "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Regs., § 2402, subd. (c).)

Factors supporting a finding that the inmate committed the offense in an especially heinous, atrocious, or cruel manner include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense.  (Regs., § 2402, subd. (c)(1).)

[FN16.]  Suitability factors are: (1) the absence of a juvenile record; (2) "reasonably stable relationships with others"; (3) signs of remorse; (4) a crime committed "as the result of significant stress in [the prisoner's] life"; (5) battered woman syndrome; (6) the lack of "any significant history of violent crime"; (7) "[t]he prisoner's present age reduces the probability of recidivism"; (8) "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release"; and (9) the inmate's "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d)(1)-(9).)

"[T]he governing statute provides that the Board *must* grant parole *unless* it determines that *public safety* requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction. (Pen.Code, § 3041, subd. (b).)  And as set forth in the governing regulations, the Board must set a parole date for a prisoner unless it finds, in the exercise of its judgment after considering the circumstances enumerated in section 2402 of the regulations, that the prisoner is unsuitable for parole.  Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." (*Rosenkrantz, supra,* 29 Cal.4th at p. 654, 128 Cal.Rptr.2d 104, 59 P.3d 174, Italics added.)[32]

"[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board]. . . .  It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole.  As long as the [Board's] decision reflects *due consideration of the specified factors* as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision."[33]

---

[32] *Id.* at 582-83 (emphasis in the original).

[33] *Id.* at 585 (emphasis in the original) (quoting *Rosenkrantz*, 59 P.3d at 218).

In this case, this Court finds the history of Benson's appearances before the parole board, as summarized by the dissent in the California Court of Appeal, particularly relevant.

Benson was first eligible for parole in March 1990.  In his first appearance before the Board in April 1990, he was deemed unsuitable for parole for several reasons.  First were the circumstances of the commitment offense.  The Board recited that "[t]he offense was carried out in a dispassionate and calculated manner which exhibits a callous disregard for the life or suffering of another.  The motive of the crime is very trivial in relation to the offense.  The murder of the victim did not deter [Benson] from attempting to cover-up his offense by binding the victim's hands, weighting her body with concrete and dumping the body off the San Mateo Bridge."  The Board also pointed to minor disciplinary infractions, but commended Benson "for remaining disciplinary free since July 1988 and for receiving numerous laudatory chronos relative to his work ethic."  The Board pointed out that Benson had not "totally participated in beneficial self-help or therapy programs.  He has failed to demonstrate evidence of positive change."  The Board relied in part on the fact that Benson's January 1990 psychiatric evaluation was "not totally supportive of release in that Dr. Walk reports that the prisoner's violence potential in a less controlled setting is considered to be average as opposed to below average."  The panel found that Benson's "gains are short-term and he must demonstrate an ability to maintain gains over an extended period of time."

Benson was next considered for parole in November 1991.  In multiple psychological evaluations performed preparatory to that hearing, his violence potential was found to be "minimal"[2] and "extremely minimal."[3]  The evaluators also agreed that substance abuse did not appear to be a concern.  Benson "expresse[d] deep and authentic remorse and guilt over his actions, and there is no question that he continues to experience a good deal of pain over his role in the death of his wife."  However, the evaluators felt that Benson had not yet "dealt with all the ramifications of his actions" and agreed upon his need for therapy.  In finding that Benson was not yet suitable for parole, the Board first reiterated that it was relying on the commitment offense ("The offense was carried out in an especially heinous, atrocious and cruel manner which exhibits a disregard for the life of others"), but continued: "The panel finds the prisoner needs therapy in order to face, discuss, understand and cope with stress in a nondestructive manner.  Until progress is made he continues to be unpredictable and a threat to others.  [¶] Nevertheless, the prisoner should be commended for his excellent work reports and habits, for upgrading his job skills as a machinist, for his involvement in the Breaking Barriers Program, for his participation in Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) and for being disciplinary free."

[2] According to one evaluator, "Mr. Benson's violence potential is minimal. It would be extremely unusual for the complex series of events that resulted in the

offense to ever recur and without this he is generally a quiet, amiable and decent man. He is not antisocial, predatory or aggressive to any marked or even minor extent. He longs for the peaceful and settled life he once had prior to the offense and should revert to that without any problems upon release. He is so consumed with guilt about his actions that his chances of ever acting this way again are almost nil."

[3] According to the second evaluator, "Mr. Benson presents with a history that is virtually devoid of any pattern of antisocial or serious criminal activities, save for the instant offense. Given the evidence considered during the course of this interview, his potential for future violent actions currently seems extremely minimal."

Benson received another psychological evaluation in September 1993, in anticipation of his next parole hearing. The evaluator observed, "Since his last appearance before the Board, and for the past five years he has remained completely disciplinary free. He has been assigned as a Journeyman Machinist since July 7, 1993, making satisfactory progress." The evaluator noted that Benson had not participated in group therapy, in part because it had not timely been made available and in part because he did not wish to participate in such a program, but felt that this did not affect Benson's "parole readiness." The evaluator concluded: "This report is entirely in support of parole. Mr. Benson's criminal behavior is not significantly related to any current diagnosable psychopathology. While incarcerated his level of functioning has greatly improved and would likely continue improv[ing] in a less controlled setting, such as the community. His violence potential has been estimated to have been minimal. At present it is regarded as having been reduced to the point of negligibility. [¶] . . . While individual or group therapy would perhaps improve his overall psychological functioning, it is certainly not necessary for parole readiness. While he possesses many characteristics of a prime therapy candidate, the clinical need in relation to his successful parole simply is not there. Therefore, no recommendations are offered at this time." Nonetheless, at his next parole hearing on May 12, 1994, Benson was again found unsuitable for parole, the panel repeating the incantation, "The offense itself was carried out in an especially heinous, atrocious, cruel and callous manner . . . which exhibits a callous disregard for the life and suffering of another . . .' and also rejecting the view that Benson did not need further therapy. Referring to the conclusions of the 1991 evaluators, the Board stated "the prisoner has not sufficiently participated in beneficial self-help and therapy programs . . . ."[4] The panel recommended that Benson participate in "any therapy program that might be available to him so that he might gain insight into the—the offense itself."

[4] The panel also stated that Benson needed to reinvolve himself in a substance abuse program, but the record contains nothing that suggests the basis for this conclusion. No report expressed any concern that Benson had or was likely to revert to any form of substance abuse. To the contrary, evaluators were in

14

agreement that "alcohol and marijuana would seem to have been a minor and peripheral factor in the commission of this offense . . . ." [I]t is not believed that conditions of parole will require close monitoring of illegal substances."

This pattern repeated itself the following year. Benson was again evaluated by two different psychiatrists, one in September 1994 and another in February 1995, both of whom expressed the same positive opinions. The evaluators reported that Benson had become a Buddhist and was attending meetings of Alcoholics Anonymous. "He has continued to program well, has numerous laudatory chronos, and his work evaluations are generally excellent. . . . He should be able to find work without difficulty if and when paroled in the area. . . . He has not had a CDC 115 for six years. . . . He has in the past participated in Narcotics Anonymous and in the "Breaking Barriers" program. He has a clear understanding of what went wrong on the occasion of the commitment offense and he feels a profound sense of remorse and, of course, wishes he had handled it another way, i.e., by separating from his wife before any disaster such as the instant offense occurred. He takes full responsibility for it. He does not rationalize it as being related to substance abuse. He, on the other hand recognizes that he must be abstinent and plans to do that. He has indeed taken a vow to do so. . . . [¶] CONCLUSIONS: Any diagnosable psychopathology he had during the earlier part of his incarceration appears to be in remission or to have disappeared. He seems to have invested considerable energy and time into his own rehabilitation. It appears he will continue to do so. His violence potential in the institution is demonstrably lower than average. It would appear that his violence potential if paroled would continue to be less than average, unless of course, he became involved with alcohol or other substances of abuse, which at this point does not seem likely." Although Benson apparently had not participated in group therapy as the Board had previously recommended, the psychiatrists advised that "there is no indication for any treatment at this point and he should continue to rehabilitate himself along the lines he has chosen to do so." Nonetheless, at the next parole hearing in April 1995, the Board once again found him unsuitable because he "would pose an unreasonable risk or danger to others if given a parole date," explaining "[f]irst of all is the commitment offense where it shows that you didn't have any regard at that time for the life and suffering of another human being." The panel again commended Benson for doing well in prison but, without mentioning the contrary recommendations of the psychiatrists, told him "we don't feel that you've adequately participated in therapy, and we feel that this is very important for you." This time he was denied parole for two years.

The pattern was the same in 1997. Benson was evaluated by still another staff psychiatrist who concluded that the only aspect of his history that "was new or different is he has become very actively involved in Buddhism in recent years." Again, the Board repeated, "The panel has reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole. . . .  The offense was carried out in especially a

cruel and callous manner.  The offense was carried out in a manner which exhibits a callous disregard for the life and suffering of another. . . ."[5]  The panel again mentioned that Benson "should be commended for being disciplinary free since 7/88.  He has good work reports," and he was urged to "remain in your tutoring program because . . . it does you and the people that you're helping a lot of good. And also remain in your-any of the other self-help and therapy programs that you're currently ... involved in. And I guess you'll remain a lead man in your tool and die machinist work. It indicates that you've done real well in that area, so keep that up."  Parole was denied for one year.

[5] On this occasion the panel also referred to Benson's supposedly "unstable social history," prior petty criminality, and minor prison disciplinary offenses prior to 1988.  However, these factors find only limited support in the record, they were entirely discounted in prior evaluations, and they were not mentioned or relied upon in the April 2005 determination which is the subject of the present petition.

The story was the same the following year.  Yet another prison psychologist reviewed Benson's entire history, performed a personal evaluation, and concluded that there were no psychological contraindications to his release on parole.  According to this evaluator, "Mr. Benson has been in custody now for 17 years. He has remained essentially disciplinary-free in the institution. Assessment of [d]angerousness within the controlled setting of the institution is seen as being below average in comparison to other inmates.  This is based on the fact that he has remained disciplinary-free and has successfully programmed, is well liked by supervisors, and is making a good adjustment.  If released to the community, assessment of dangerousness is also seen as being below average in comparison to other inmates.  In fact, in this case, his dangerousness is seen as minimal.  At the time of the offense he was intoxicated on alcohol and Marijuana.  If there are any risks, it would be use of debilitating substances such as alcohol or Marijuana.  The probability of his use of these substances is low. . . .  [¶] Mr. Benson has no program needs.  He has excellent vocational skills that will enable him to obtain viable high-paying employment in the community.  He has completed. his. academic requirements.  There is no need in this case of initial psychotherapy or psychological evaluation.  There are no psychological contraindications to this man's release on parole."  Yet, the conclusions of the Board panel did no more than mimic findings from prior years.  "The panel reviewed all information and decided that you're not suitable for parole at this time.  The offense was carried out in an especially cruel and callous manner.  The offense was carried out in a manner which exhibits a callous disregard for the life and suffering of another . . . ."[6]  The panel once again commended Benson "for being disciplinary-free and programming well and also for assisting other prisoners in learning reading and other basic skills" but, drawing upon the findings of prior panels and disregarding the conclusions of the professional evaluator, stated that Benson "needs therapy in order to face, discuss, and gain insight into why he committed the crime.  The

16

prisoner is denied parole for a period of one year.  And, of course, the reason is
the cruelty of the crime."

[6] This panel also made reference to matters touched upon by the prior panel (see
fn. 4, *ante*) but seemingly attached little significance to them. "The prisoner has a
very limited criminal record that amounted to just a couple of misdemeanor
arrests, one for driving without a license in his possession and the other was a
petty theft.  But still it was an unstable social history and, by his own admission,
was using narcotics and drinking alcohol.  He failed to demonstrate evidence of a
positive change.  Misconduct while incarcerated included three CDC 115's and
four CDC 128(a)s.  However, the last 115 was 7/20/88, so he's been disciplinary-
free for a little over ten years."

    In 2000 the reprise was the same. An assessment performed by yet another
psychologist "did not reveal any new problems or changes since the last report."
But again, "[t]he panel reviewed all information received from the public and
relied on the following circumstances in concluding that the prisoner is not
suitable for parole and would pose an unreasonable risk of danger to society or a
threat to public safety if released from prison.  And number one was the
commitment offense which the panel found was really a brutal and unprovoked
attack on a relatively defenseless woman."  The balance of the decision reiterates
the history taken from prior decisions, again noting that Benson had "remained
disciplinary-free over an extended period of time," "upgraded vocationally" and
developed job skills, suggesting that he "firm up" his employment plans if granted
parole, and expressing "some concern about the lack of any formalized recent
counseling or programs involving domestic violence or violence potential and we
would like to see him take advantage of those if they become available to him."

    In July 2001, Benson was re-evaluated by the clinical psychologist who
had evaluated him three years before, who found his 1998 assessment "still
current and valid.  There is no evidence of any mental or emotional problems. Mr.
Benson has an excellent attitude.  He continues to be actively involved in
programming including teaching literacy to other inmates three days a week.
Violence potential, in this case, is definitely low in comparison to other inmates.
He continues to have a strong community support.  There are no psychological
factors evident that would interfere with release to the community."  The panel's
response was the same:  "The panel has reviewed all of the information received
from the public and relied on the following circumstances in concluding that the
prisoner is not suitable for parole. . . .  The offense was carried out in a very
special-in an especially cruel and very callous manner.  It was carried out in a
manner which demonstrates an exceptionally callous disregard for human
suffering, and the motive for the crime was very inexplicable and trivial in
relation to the offense. . . ."  The decision reiterated the details of the crime and
other historical factors repeated in prior years' decisions.[7]  The Board added,
however, that Benson had displayed a "matter of fact attitude about the
commitment offense [that] was totally devoid of any apparent regret or remorse

about taking his wife's life" and "an argumentative posture about providing documents when we were trying to assist him with his parole plans."  The Board again commended him "for his involvement in AA, and he did spend two years in the voc mill and cabinet, and he has been tutoring in the Inmate Literacy program, and he has been receiving satisfactory work reports."  He was denied reconsideration for two years and advised that in the future the Board would require documented confirmation of his parole plans.

[7] The Board noted that Benson "has a history of unstable or tumultuous relationships especially with his deceased wife," but there is little if any evidence in the record that he had tumultuous relationships with others.  According to the evaluation performed in 1991, "Mr. Benson presents with a history that is virtually devoid of any pattern of antisocial or serious criminal activities, save for the instant offense."

The Board decision that is the focus of this habeas corpus petition is the denial of Benson's latest application for parole on April 14, 2005.  In preparation for the parole hearing another thorough psychological assessment was performed in December 2004 by still another psychologist.  The evaluator's conclusions could not have been more positive.  "Beginning with psychological evaluations in 1987 through 2000 this inmate has been consistently evaluated to have a low violence potential and to be a good candidate for parole.  It has been note[d] that [he] expressed genuine guilt for [h] is offense (1987); that he has 'programmed in an above average manner and shown good psychiatric stability' (1990); that he was not seen as being in need of psychotherapy.  It was indicated that he did not rationalize the offense and accepted full responsibility for the victim's death (1993); that there was 'no evidence of psychopathology in this case.'  It was noted, 'He has a clear understanding of what went wrong . . . and feels a profound sense of remorse.' (1994); assessment of dangerousness is also seen as being below average in comparison to the other inmates (1998)."  His release plans, according to the evaluator, were equally positive and realistic.  "[H]e hopes to parole or transfer to Sacramento where one of his brothers reside[s].  He has the offer of housing, initial financial support and an auto when he paroles.  He plans on working as machinist. . . .  [H]is plans are practical and realistic.  He has a high level of stable support in the community and has maintained and even improved his skills as a machinist in the CDC."

Finally, the December 2004 report contained an extended evaluation of Benson's violence risk factors, beginning with an explanation that an inmate's risk for violence "can be evaluated based on three key actuarial factors—A) social history, B) clinical presentation and C) management of future risk"  Each of these factors indicates that Benson presents a low risk of future violence. According to the report: "A) Social History: . . .  This inmate evidences a low number of historical risk factors.  There is no history of serious social and behavioral problems as a child or adolescent.  He has no juvenile record or prior adult criminal record.  Significantly, there is no history of violence predating his

controlling offense.  And he has a stable and productive work history. . . .[8]  <u>In this risk domain the inmate presents a low risk of future violence.</u> [¶B) <u>Clinical Presentation</u>: . . .  Based on this evaluation and reviewing past evaluations, this inmate appears to demonstrate an understanding of this offense.  He appears to take responsibility for his crime and to be remorseful for his actions.  His overall attitude has been positive, as evidence[d] by his long participation in AA/NA and positive adaptation to the CDC.  There is no evidence of a major mental illness or related symptoms.  <u>In this risk domain the inmate presents a low risk of future violence.</u> [¶ C) <u>Management of Future Risk</u>: . . .  This inmate has expanded his range of work skills as a machinist within the CDC and has maintained a stable and productive work history.  He has been active in furthering his education through tutoring other inmates for nearly 11 years.  And his commitment to learning and practicing Buddhism is commendable and appears to play a role in his stable emotional functioning.  He has had no serious CDC-l15.  His last disciplinary action was in 1988 for missing a count.  His plans for paroling are practical and he appears to enjoy a high level of support in the community.  <u>In this risk domain the inmate presents a low risk of future violence.</u>" (Underscoring in original.)  The evaluation concludes as follows:  "'Overall, evaluating the three categories of actuarial risk for this inmate, he is considered a low risk when it comes to potential future acts of violence, his prior lack of criminal and violent history are significant as has been his positive adaptation to the CDC these past 20 years.  He appears to have matured significantly on an emotional level as evidenced by his tutoring and religious practices and the high level of work he has maintained.'"

[8] The deleted sentences read as follows:  "However, beginning at an early age (17), he started abusing drugs and alcohol and developed serious problems.  He is diagnosed a personality disorder and his drug abuse and personality factors were clearly evident in his offense.  There is also a history of unstable interpersonal relationships."

The Board again denied parole in the familiar manner:  "[T]he panel reviewed all of the information received from the public and relied on the following circumstances in concluding that you're not yet suitable for parole and would pose an unreasonable risk of danger to society if released from prison. This is primarily based on the commitment offense. . . .  This is certainly a violent death for this young woman and it was certainly carried out in a manner that demonstrates a callous disregard for human suffering.  And the motive for this crime was certainly trivial.  There were so many other choices that could have been made here and none of them involved a brutal murder of this young woman."  The Board noted a few oft-repeated facts concerning Benson's prior history ("one prior arrest that was for petty theft, it was a misdemeanor, and he does have a history of substance abuse which does go to his own stable social history") and his record in prison ("three 115 disciplinary reports but the last one was back in 1988 and has not had a 128(a) counseling chrono since 1999").  As to the most recent

psychological evaluation, the Board stated simply,  "The psych evaluation dated 12-04 by Dr. Freitas was supportive."  The Board again commended Benson for "doing a good job, you have been involved in Laubach [literacy tutor program] for 11 years which is very commendable.  You've been disciplinary free since 1988.  You've continued to participate in substance abuse programming and you've gotten good work reports and you've been very involved obviously in your [Tao] and Buddhist studies."  The Board also noted that in response to the suggestions made at his preceding parole hearing Benson had "letters from all three of your brothers indicating that they would offer you both physical and financial support until you were able to find work and be on your own."  Nonetheless, the Board stated that the district attorney of the county in which the offense occurred "indicate[d] an opposition to a finding of suitability at this time"[9] and concluded that "the positive aspects of behavior do not outweigh the factors of unsuitability."  The chair of the panel ended the hearing with the suggestion that Benson repeat programs he had already successfully completed and bring to the next parole hearing materials to explain his religious studies.[10]

[9] The district attorney's opinion is based solely on Benson's commitment offense and appears to rely solely on the facts contained in Benson's probation report dated January 1983.  It fails to address Benson's improvements while in prison or any of the numerous other factors bearing on Benson's suitability for parole.

[10] "[B]ecause of the kind of crime that it was, if you can do something related to domestic violence I think that that would—it's been quite a while, Breaking Barriers was a long time ago, it's been quite a while since that issue has been dealt with.  And I think that one thing that would be really helpful to you, because probably most of the commissioners are not going to be familiar with the work that you're doing in your religious studies, is if you could bring information to the panels to show them what those studies involve. . . .  [¶][B]ecause some of the issues that are of concern probably are being addressed but unless we see it in writing it doesn't exist. . . .  [¶] And once again continue with the substance abuse program. . . . Whether the psych report says that it's being addressed or not, I can tell you for a fact that if it goes to the Governor's Office they're going to make that an issue so while it's available to you, you should participate in it."[34]

The dissenting justice then performed an extensive analysis under California law at that time, including *Rosenkrantz* and *Dannenberg*.[35]  In Part A of the analysis, "The Nature of the

[34] Docket No. 10-3, pp. 80-91.

[35] Docket  No.13-8, pp. 91-103.  Another justice, indicated that, except for the California Supreme Court's decision in *Dannenberg*, he would have joined all but part B of the dissent.  Docket No. 10-3, p. 78.

Commitment Offense," the dissent discussed the five factors set forth in the Regulations to support a finding that the offense was committed "in an especially heinous, atrocious or cruel manner," citing § 2402(c)(1).[36]  The dissent noted that neither of the first two factors, multiple victims or that the offense was carried out in a dispassionate or calculated manner had any application.[37]  The dissent also found that, because there was no evidence that would support a suggestion that the viciousness of the offense went beyond the elements of second degree murder, the Board impermissibly relied on the fourth factor—an exceptional disregard for human suffering."[38]

The dissent noted that, while disposing of the body was improvident, there was no suggestion that Benson took any satisfaction from mutilating the body or experienced any feeling that suggested he is likely to repeat the offense.  This negated the Board's finding with respect to the third factor—that "the victim was abused, defiled or mutilated during or after the offense."[39]  Finally, the dissent disposed of the fifth factor—triviality of the motive—noting that there is "no evidence in the record or support from the myriad of mental health professionals who had

---

[36] Section 2402, subdivision (c) of the Regulations reads in part as follows: Circumstances tending to indicate unsuitability include: (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:  [¶] (A) Multiple victims were attacked, injured or killed in the same or separate incidents.  [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.  [¶] (C) The victim was abused, defiled or mutilated during or after the offense.  [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.  [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

[37] Docket 10-3, pp. 93-94.

[38] Docket 10-3, pp. 94-96.

[39] Docket 10-3, pp. 96-97.

examined Benson to support the view that his motive was less significant than the motive

underlying other second degree murders or that Benson is so indifferent to the significance of

killing a person that he is likely to do so again if released on parole."[40]

The dissent concluded:

> The Board's conclusion that Benson would pose an unreasonable risk of danger to society thus is supported by no evidence—not even a "modicum." (See *In re Rosenkrantz, supra,* 29 Ca1.4th at p. 677.)  While the commitment offense alone *can* be sufficient to support such a conclusion, as indicated above in order to do so the facts of the offense must "rationally indicate" that Benson would pose an unreasonable risk to society if released.  As just shown, the evidence in the record establishes exactly the contrary.  (See *In re Smith, supra,* 114 Cal.App.4th at p. 369 ["the record provides no reasonable grounds to reject, or even challenge, the findings and conclusions of the psychologist . . . concerning Smith's dangerousness.  In the absence of such grounds or other evidence, the . . . view . . . is unsubstantiated speculation and as such appears to be arbitrary and capricious]; *Scott* I, *supra,* 119 Cal.App.4th at pp. 894-897.)[41]

Based upon this conclusion, the dissent stated:

> I would grant the petition for a writ of habeas corpus, vacate the denial of parole, and order the Board to conduct a new parole suitability hearing consistent with the views expressed in this opinion. (See *Scott I, supra,* 119 Cal.App.4th at p. 899.)[42]

This Court is not unmindful that, in a federal habeas proceeding challenging the denial of

parole, it neither re-weighs the evidence nor substitutes it's judgment for that of the Board.  This

Court is also mindful of the fact that under California law, judicial review of a decision denying

parole is "extremely deferential."[43]  Nonetheless, for the reasons expressed by the dissenting

---

[40] Docket 10-3, p. 97.

[41] Docket 10-3, p. 98.

[42] Docket 10-3, p. 103.

[43] *Rosenkrantz,* 59 P.3d at 210.

justice of the California Court of Appeal, even viewing the decision of the Alameda County Superior Court affirming denial of parole through this doubly deferential lens, based upon the record before it and upon the subsequent decisions of the California Supreme Court in *Lawrence* and *Shaputis*, this Court holds that the decision of the Alameda County Superior Court was contrary to California law and based on an unreasonable determination of the facts in light of the evidence.[44]  Benson is entitled to relief under his first ground.  Thus, this matter will be remanded to the Board for a new hearing consistent with the decision in this case.

Ground 2:  Denial of a Fair and Unbiased Hearing.

Normally, this Court having granted relief on the first ground, would not address any other ground.  Because the issue may arise in the new hearing, however, Benson's second ground is not necessarily moot.  At the outset of the hearing, Benson, shackled in accordance with institutional policy, declined to attend and participate further in the parole suitability hearing. The Board nonetheless proceeded to conduct the hearing in Benson's absence.  Benson argues that this violated Cal. Penal Code § 3041.5(a)(3) and denied him his due process right to a fair and unbiased hearing.  As a result, there was no one present at the hearing to challenge the information presented to and relied upon by the Board.[45]  The Alameda County Superior Court rejected Benson's argument, holding.

_____

[44] This Court notes that the Board considered itself hampered by the fact that Benson chose to absent himself from the hearing.  As discussed below in connection with the second ground, proceeding *in absentia* in the parole setting does not violate any federal constitutional provision.  By choosing to voluntarily absent himself from the hearing, however, Benson exposes himself to, and must bear any adverse consequences of, that choice.

[45] Benson, having waived his right to counsel, was not represented at the hearing.

The Court notes that [Benson] refused to remain in the hearing due to the institutional rule that he be in physical restraints during the hearing. [Benson] may have been within his rights to object to the institutional policy. However, [Benson's] absence deprived the BPT from obtaining additional information about [Benson's] programming and updated information about specific job opportunities. While it is purely speculative as to whether [Benson's] absence affected the outcome of the hearing it certainly was not advantageous to [Benson].[46]

To the extent that Benson challenges the Board's action under the state law requirements set forth in Cal. Penal Code § 3041.5(a),[47] this Court declines to consider that challenge for failure to state a federal claim.[48] Thus, this Court renders no opinion as to the validity of Benson's position on the shackling requirement under state law.

Due process in the parole context only requires that an inmate be afforded an opportunity to be heard and, if parole is denied, that the inmate be informed in what respects he or she falls short of qualifying for parole.[49] It is well established that where, as here, a criminal defendant's voluntarily absence from the proceedings constitutes a waiver of any right to be present and the tribunal may proceed to adjudication in his or her absence.[50]

---

[46] Docket 10-2, p. 159.

[47] Although Benson cites § 3041.5(a)(3), the correct cite is to § 3041.5(a)(2), which states that the defendant shall be permitted to appear. This Court does note that nothing in that provision, or any reported decision construing it, compels the result Benson seeks.

[48] *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (it is presumed that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Engle v. Isaac*, 456 U.S. 107, 119 (1982) (challenging the correctness of the application of state law does not allege a deprivation of federal rights sufficient for habeas relief); *Bell v. Cone,* 543 U.S. 447, 455 (2005) (a federal court may not lightly presume that a state court failed to apply its own law).

[49] *Greenholtz*, 442 U.S. at 15.

[50] *Crosby v. United States*, 506 U.S. 255, 262 (1993) (citing *Taylor v. United States*, 414 U.S. 17 (1973)).

The Alameda County Court did not address the implicit question of whether the institutional policy of requiring inmates be physically restrained at parole suitability hearings negated the voluntariness of Benson's absence.  When there is no reasoned state-court decision denying an issue presented to the state court and raised in a federal habeas petition, this Court must assume that the state court decided all the issues presented to it and perform an independent review of the record to ascertain whether the state-court decision was objectively unreasonable.[51] The scope of this review is for clear error of the state-court ruling on the petition:

> [A]lthough we cannot undertake our review by analyzing the basis for the state court's decision, we can view it through the "objectively reasonable" lens ground by *Williams*. . . .  Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.  Only by that examination may we determine whether the state court's decision was objectively reasonable.[52]

"[A]lthough we independently review the record, we still defer to the state court's ultimate decision."[53]

As the Ninth Circuit has observed, whether a general policy of physical restraint of defendants for a proceeding in front of a judge violates due process has not been decided.[54] Litigation before the Supreme Court concerning defendants restrained during criminal proceedings arises in the context of proceedings in front of juries on the basis of a fear that a jury

---

[51] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam).

[52] *Delgado v. Lewis* (*Delgado II*), 223 F.3d 976, 982 (9th Cir. 2000) (internal citation omitted); *see also Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004).

[53] *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

[54] *United States v. Howard*, 480 F.3d 1005, 1012 (9th Cir. 2007).

will be prejudiced by seeing the defendant in shackles.[55]  The Second Circuit has, however, concluded that, because a judge in a pretrial hearing presumably will not be prejudiced by seeing a defendant in shackles, the rules regarding restraints do not apply to proceedings before a judge.[56]  The Board, like a judge, presumably would not be prejudiced by seeing an inmate appear before it in restraints.

Even if shackling were an error of constitutional dimension, the appropriate relief would be to remand the matter to the Board with directions to the warden of the institution to permit Benson to appear without restraints.  Surely, Benson does not suggest that by voluntarily absenting himself from the hearing to protest the restraint requirement, he was automatically entitled to be paroled.  Such a result is counterintuitive; otherwise, by simply refusing to appear at the hearing, inmates could guarantee themselves parole.  Accordingly, based upon the record before it, this Court cannot say the decision of the Alameda County Superior Court in this case with respect to Benson's second ground was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[57]  Benson has not presented a question of federal constitutional dimension.

---

[55] *See, e.g., Deck v. Missouri*, 544 U.S. 622, 630 (2005); *Illinois v. Allen*, 397 U.S. 337, 344 (1970).

[56] *United States v. Zuber*, 118 F.3d 101, 104 (2d Cir. 1997).

[57] 28 U.S.C. § 2254(d).

26

## V.  CONCLUSION AND ORDER

Benson is entitled to relief on the first ground raised in his Petition.  Accordingly,

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **GRANTED**.

**IT IS FURTHER ORDERED THAT** the denial of parole is vacated and this matter is

remanded to the California Board of Parole Hearings for further proceedings consistent with the

decisions of the California Supreme Court in *In re Lawrence*, 190 P.3d 535 (Cal. 2008), and *In re*

*Shaputis*, 190 P.3d 573 (Cal. 2008).

**IT IS FURTHER ORDERED THAT**, if the Board of Parole Hearings has not held a

hearing within 120 days of the date that this decision becomes final, *i.e.*, no longer subject to

direct review, the Secretary, California Department of Corrections and Rehabilitation, must

release Benson to parole status.

The Clerk of the Court is to enter final judgment accordingly.

Dated:  August 11, 2010.

     /s/ James K. Singleton, Jr.     
JAMES K. SINGLETON, JR.
United States District Judge
